Good morning, Your Honors. Counsel, you may proceed. Thank you. May it please the Court, my name is Daniel Weersbaugh. I'm here from Sefrat Shaw, and I'm appearing on behalf of Mr. Silvis. To the extent possible, I'd like to reserve as much as close to five minutes as possible for rebuttal. You control the time, Counsel. Just watch the clock. Thank you. This Court should reverse this case for two separately equal but dispositive reasons. Number one, there is deliberate indifference here. There is deliberate indifference because the doctors did nothing for two and a half years after Mr. Silvis was admitted to Avonell Hospital My apologies, Avonell Prison in May of 2001. What's the evidence in the record that suggests that the doctors even knew about this? What's the evidence of subjective awareness? The evidence of subjective awareness comes from Mr. Silvis' complaint, which was verified. That's at SCR 563 to 572. And when I say SCR, I refer to the appellant's supplemental excerpts of record. He had two declarations, which were at SCR 152 to 155, and then also at 302 to 314. And then he also had a deposition, which was located at SCR 219 through 280, and 340 to 524. Specifically what he had was his complaint stated that he provided repeated notices and complaints and written letters to the doctors. What he also did is in his declaration at SCR 304 to 306, he began writing letters to doctors as soon as he was admitted to Avonell. That would be the case. Could I take you through the doctors? Because, you know, I think the delay in diagnosis, I completely understand his complaint. In these two years, he knows something's wrong. Not enough is happening. But Reed and Reese, those doctors come after this delay in diagnosis, don't they? That's right. Reed and Reese, yes, Reed and Reese, they come after. But having said that, there are two elements to this timeline. There is the delay in diagnosis. Correct. But now I'm kind of focusing on the delay in diagnosis. That's correct. Thank you, Your Honor. So they came afterwards. And then Dr. Davis, he's not involved in this delay in diagnosis period, right? No. I believe that Dr. Davis is involved, because he is the CMO, so he's the administrator overseeing it. He was receiving letters from May 18th of 2000. And so when does he arrive on the scene? Dr. Davis, I believe, was there from 1988 through 2004. So he was at Avanell from the beginning. And Dr. Smith, do we have anything beyond a single involvement with him during this delay period? Dr. Smith, from May of 2000 through April of 2003, he received letters from Mr. Silvis on numerous occasions. There is what's called a prison chronologue that Mr. Silvis himself submitted as part of a declaration. If you look at that, that is SCR 125 through 146. And there are, I counted, approximately 15 times where Mr. Smith received some sort of letter from Mr. Silvis. And there's no evidence in the record that I could tell other than this one examination that Mr. Smith did anything. And what about Dr. Perry? Dr. Perry, using that same prison log, 125 to 146, in the delay of diagnosis, he was notified approximately 12 times in terms of written letters. And then Dr. Pappenfuss, to address the other doctor for that time frame, was approximately 14 times. So one other question I have is, in terms of causation moving to the second, even if there is this delay in diagnosis, in the end, as I understood, the medical judgment was that not to proceed with the radiation, and that was partly his decision. And he decided not to have that other surgery. So could you tie up how it matters in the end? Well, Your Honor, if you like, I can do both the pre-op and the post-op. Specifically to your question on the post-op, the – what the records state, there are instances where it says that Mr. Silvis did not want to proceed. However, in his deposition, Mr. Silvis, specifically with respect to Dr. Rahimafar, Mr. Silvis denied that. He said during his deposition that, yes, I see what – that's what the record says, but that's not what I was talking about with him. And so there are instances – and I'm bringing that one up specifically because it was Rahimafar that performed the surgery and then also was providing additional post-op consultation. So with respect to that, I posit that Mr. Silvis at the time was requesting the radiation, was requesting the physical therapy. I don't think there's any dispute about that in terms of the physical therapy, but that he only received one physical therapy training session with two neck exercises. But I would say that he had requested it, and, in fact, there were letters. He saw Dr. Weed several times during the post-op consultation period. And each time, according to this prison log, which is part of the record, Mr. Silvis was asking for the radiation and Mr. Weed – And wasn't there a medical disagreement about this radiation? Well, Your Honor, I don't know that I would call it a disagreement. I would say that – Different views? Well, I would say that the doctors, the outside treating physicians, you had Dr. Rahimafar, you had Dr. Laramo, and you had Dr. Pineda, who all saw him, Mr. Silvis, I would say reasonably – in fact, that might be stretching it, because the first time that Rahimafar saw Mr. Silvis after his surgery was almost 60 days after. And so if you've got a brain tumor, I don't think waiting 60 days is good medical judgment. But in terms of whether there was a disagreement or a difference, each of those doctors was prescribing this gamma ray radiation. In fact, Dr. Laramo's record, which is at a replacement SEOR 115, said quite explicitly, Silvis will need gamma ray knife radiation. So you have Dr. Rahimafar, who may have said that we should check it out or we should come back in 60 days to find out, but he was still prescribing it. He was still recommending it. So I don't think it was a disagreement. And I would also note that when Mr. Silvis was transferred over to Colonial State Hospital, he did receive the gamma ray radiation in 2007. He received it over a period of a week, and there was marked improvement, and it was immediate improvement. So I don't think that it was a disagreement. I just think that all of the doctors that he saw prescribing it, it's just a matter of the delay in actually getting it. Counsel, your hurdle here is a very high one, deliberate indifference. What's your strongest argument on deliberate indifference, especially after the diagnosis? Especially after the diagnosis, I would say, is the delay. So after the diagnosis — That's deliberate indifference? Well, yes. The — I believe that's the Jet v. Penner case can say that a deliberate indifference — I apologize. It's Clement v. Gomez from 2002. This Court held that intentionally denying or delaying access to medical care can be construed as deliberate indifference. I would note that the Clement case overturned summary judgment, finding sufficient evidence to go forward, so that you don't necessarily today need to find deliberate indifference. All you need to find is that there are sufficient evidence and sufficient facts in dispute to overcome summary judgment. The post-diagnosis, there was a delay. So the — in my mind, the original diagnosis did not come until April of 2003. What you had there was Dr. Seusbury in January of 2003, who's an ear, nose and throat doctor. So he's not a brain surgeon. He saw Dr. — Mr. Silvis and his medical record, which is part of this record at replacement S-E-O-R 170 and 171, he diagnosed as unilateral hearing loss with tightness and vertigo, and his record also says rule out acoustic neuromas. Acoustic neuroma, as we know from the record, is a brain tumor, and that's exactly what Mr. Silvis was diagnosed. The problem here is that this request came in January of 2003. In March of 2003, 45 days later, March 15th, it's at that point that the appellees at that time first requested the MRI, the CT scan, and then the MRI did not occur for another 15 days, and then the diagnosis did not come until the middle end of April. So during the diagnosis area, you've got this delay. Now, I would say that when you've got a brain tumor growing and you've got symptoms of vertigo, headaches, nausea, dizziness, that any delay, any delay of 45 days, any delay of four days, I mean, you had — in the Clement Vigoma's case, you had a delay of four hours, which could be deliberate indifference after a pepper spray was used during a prison fight. So Clement, you had four hours. Here you've got much longer time. And then after surgery, as I mentioned previously, Dr. Rahimafar, the surgeon, did not see Mr. Silvis until approximately 90 days after surgery. The first consult, the post-op consult, was with Dr. Sewsbury, and that was in early June, so that was 30 days. Again, he's an ear, nose, and throat specialist. He's not a brain surgeon, and he's not the surgeon that performed the surgery on Mr. Silvis. Then I will say that in the record, there does appear to be many instances of post-op consultation. However, I don't think that gets the appellees where they want to go, because from the Jet V Penner case, there was a fractured hand, and from December of 2001 until May of 2003, there were instances of many referrals and consultations, but that was the first time in that specific case where the patient received the special consultation that he had requested. So in Jet V Penner, you had 13 months. And here you've got, well, if you want to go all the way to 2007 when he did get the radiation, that would be approximately four years. Now, in terms of the physical therapy, I think the record is undisputed that he only had the one consultation in July of 2003. At that point, he was given two neck exercises, and that was the only physical therapy consultation that he had received while at Advanel. And with that, I'd like to reserve the rest of my time. Thank you, Counsel. We'll hear from the doctors and the State. Good morning, Your Honors. My name is Shannon Hewitt, and I'm representing appellees Drs. Davis, Smith, Pappenfuss, and Weed. I will be speaking with you for approximately 10 minutes. In Dr. Davis's private capacity, you're not representing the State, or are you? I am not. I'm representing the appellees individually. Very well. Thank you. So I will be taking approximately 10 minutes, and then I'll be turning over to Mr. Rieger, who represents Drs. Rees and Perry. I do want to make one clarification that I noted on the calendar, and I think we probably are aware of this by now, but it indicated that he was a civil detainee at the time of these events, and in actuality, he was a State prisoner. The record in this case is very clear that Mr. Silvis received extensive medical care by a team of outside medical specialists. After his surgery to remove the benign tumor, he received abundant aftercare by neurologists, neurosurgeons, ongoing radiology studies, MRIs, ENT ophthalmology consultations, and radiation oncology specialists. This case really doesn't involve so much direct care by my clients as it is referrals and authorizations for him to receive treatment that he did, in fact, receive from these outside professionals. One of the things I want to address that appellant's counsel mentioned was the radiation. I think, Judge, that you made a good point. This case, especially on the radiation issue, is nothing more than a difference of opinion between the medical specialists. The record is very clear that Dr. Rahim Afar, the neurosurgeon, as well as a radiation oncology specialist, both agreed that Mr. Silvis should not have radiation therapy. There was a small but serious risk because of the location so close to the brain stem. That was their recommendation. He saw neurologists, Dr. Laramo and Pineda, only one time in the many months of follow-up care. And they did recommend that he have radiation. So we have basically two specialists against two specialists having difference of opinions. Does that amount to our clients being deliberately indifferent? Absolutely not. I do also want to correct the record that Mr. Silvis did not receive just one physical therapy consultation. He also received physical therapy at the hospital post-surgery. He spent approximately, it was either 11 to 14 days in the hospital after his surgery and received physical therapy there as well. The appellant has indicated there was an issue of delay prior to his workup and diagnosis. And he's claimed that the verified complaint, two depositions that I took, as well as declarations show that Mr. Silvis informed my clients. I would submit, Your Honors, those documents do not provide evidence that my doctors had the information from which they could infer there was any substantial risk of harm, much less that they knew anything. We have in the record his affidavit, which indicates multiple letters, complaining of dizziness, seizures, all these symptoms. Do you agree that those were received? I do not, Your Honor. And I want to make it clear, the documents that I just mentioned, when you look at those, including his deposition, he indicates that he really didn't start writing any letters until roughly the end of March of 2003 when they were starting the workup and the diagnosis. There was a mention of a quote log, and I do want to address that, absolutely. So with that log, I want to make it clear that that was a document submitted by Silvis months after the motion for summary judgment was fully briefed, even though he says he was in possession of it before he filed his opposition. That is an unsigned, unsworn document with no indication of a date of drafting at all. Now, the Court did say the source of that document? You mean the location in the record? No. The source of the log. Well, apparently Mr. Silvis claims that at some unknown point he drafted a, essentially a journal of events. Right. If true, though, it does indicate that the person was on notice. And you're just basically saying it's not true. Well, Your Honor, it doesn't provide – there's a couple of problems with that log. First of all, it is not a sworn declaration. It is nothing more than inadmissible hearsay. It violates the best evidence rule. Where are these alleged letters? He's not indicated anywhere that he made any diligent effort to search for them or that they were lost or destroyed. In looking through here, we don't actually have the correspondence, correct? That is correct, Your Honor. We have no correspondence. And, you know – The log is entirely his own creation, is that what you're saying? That is correct. And as I indicated, he says – he claims that it existed prior to the opposition he filed to our motion, but yet did not produce this log, interestingly enough, until months after it was fully – the motion was fully briefed. But do you – basically, you're saying that – and there – you know, you've seen the log. There are a lot of entries talking about letters, and you say they just don't exist, period. Your Honor, what I'm saying is there's insufficient – that this log is insufficient evidence. No, you're claiming to be in possession of them, right? They would if they existed. I agree with that. But we have no evidence whatsoever that there is any such log or there's any such letters that existed. The other point I want to make, putting aside even the admissibility issues that I believe exist, and as we know, according to Rule 56e, the parties must present admissible evidence in support of their position. Now, the other issue is if you look at the content of this log, you will see that all it has are vague and conclusory statements. For example, mailed letter to Dr. So-and-so regarding, quote, medical symptoms, request doctor's appointment. This log does not contain sufficient information from which we could infer that my clients had the facts in which they would be on notice there was a serious medical need. So that is my point on the log. In addition, I do want to address this Jett v. Pinner case, because I think the plaintiff has hung their hat on this heavily. This case is distinguishable from Jett v. Pinner. In Jett v. Pinner, there was abundant evidence that the doctor should have been on notice of the serious medical needs of Mr. Jett. First of all, the prison records contained numerous grievances, medical slips requesting information, requesting him to receive medical care, as well as a copy of the letter that he says he sent to the defendant. In addition, there were medical records by other doctors saying this is the care that Mr. Jett needs. So it makes sense in that case that this Court said, based on that abundant evidence, we believe that doctor should have been aware of his medical needs, and we could find deliberate indifference. Therefore, reverse and remand. This case is the same. Alitoson relies on Clement. Your Honor, I just don't see Clement as applicable here. It's a case about pepper spray. In a short-term situation where there's a claim of delay of four hours, I don't believe that that case is sufficiently analogous in the facts to really apply it here. I do think Jett v. Penner is a better comparison. And as I've explained, the facts in that case are quite different as far as the notice to Dr. Penner versus the lack of sufficient evidence that our doctors had noticed prior to his workup and diagnosis. And thereafter, I think it's just very true. May I return for a minute to your statement that the log was unverified? He did submit an affidavit indicating that he was contemporaneously filing the prison log, which he verified. So why isn't that sufficient verification to indicate that it's undersworn testimony? Your Honor, I don't believe that that declaration is sufficient to incorporate the log. I think the log still suffers from serious admissibility issues, as well as the content of that log being insufficient. It's unsworn, it is unsigned, and he does not indicate in the declaration when he allegedly drafted that. No, that's all true, but it says that he is submitting the log and that it is genuine, and he signs under penalty of perjury, right? He does have such a declaration. Right. And so he submits the log separately. Let's say it's attached. It would have the same effect, wouldn't it? Your Honor, I still believe that we have issues with the log itself. Counsel, you're down to less than five minutes. I don't know if you wanted to share. Your Honor, I would just like to sum up that if we look at this Court's decision in Taguchi v. Chung, we can see how the applicable standard articulated. And I would submit in this case that the appellant, Mr. Silvis, has failed to show that my clients had sufficient facts for which they could infer there was a substantial risk of serious harm. When they, in fact, found out that he was having problems, then we can see there was extensive medical care provided by outside specialists. Regardless of the fact that he disagreed with it. Thank you very much. Thank you, Counsel. Good morning. I'm Kevin Rager with the Office of the Attorney General, and I represent Dr. Perry and Dr. Reese in this action, and I will be brief. With regard to Dr. Perry, according to the medical record, Dr. Perry saw Mr. Silvis on only a single occasion, and that was January 14th of 2003. At that time, Mr. Silvis came to the sick call line, where Dr. Perry was conducting the clinic for the day. Now, it's important to note that this was in the sick call line, as opposed to having a regularly scheduled medical appointment, because the way that it works inside the prison is the clinic is open 24 hours a day in the yard, so that inmates who are experiencing acute or symptoms of a problem at that particular moment, they can just walk in like the emergency room. The problem is when they do that at a yard clinic, the medical file is not available to the physician. So at that time, all they can do is listen to what the symptoms are that the and make a diagnosis and treatment plan based on that. So when he came in to see Dr. Perry on the 14th of January of 2003, Dr. Perry did not have the medical file available, and he noted the lack of information that was available to him in his record. Now, what he did do is he reported the symptoms as Mr. Silvis experiencing ringing or tinnitus in the ear and noted that that had been going on for a month or so. He also noted the dizziness. Upon a physical examination, Dr. Perry also noticed that he had nystigmus, an involuntary movement of the eyes which can be caused by a variety of different elements. But immediately then, on the one and only time Dr. Perry saw him, he made an urgent referral for Mr. Silvis to be seen by a specialist, an ENT specialist, and he did it on an urgent basis, and Mr. Silvis was in fact seen two weeks later by the ENT specialist. After that, Dr. Perry had no further involvement in plaintiff's care. With regard to Dr. Reese, Dr. Reese didn't even start working for the CDCR until January of 2003. He wasn't assigned to plaintiff's yard until February of 2003, and the first time Dr. Reese saw Mr. Silvis was on March 18th of 2003, and contrary to the representations by Appellant's counsel that he wasn't diagnosed with an acoustic neuroma until later in April when he was seen by a specialist, if you look at the note in the supplemental excerpts of record, page 88, you'll see that Dr. Reese, the very first time he saw Mr. Silvis, said acoustic neuroma and referred him out for an urgent MRI, which he had. Following that, Dr. Reese, over the next two years, made 14 separate referrals for Mr. Silvis to be sent out to specialists, including in April he immediately referred him to a neurosurgeon when the MRI results came back and confirmed the existence of a neuroma. And Dr. Reese and Dr. Perry are general practitioners. They are not specialists. They're not oncologists. They are not neurosurgeons. They can't provide this care and treatment on their own. All they can do is refer it out, and each and every time they were asked to do so, they did. Counsel, were either of these two doctors allegedly notified by the entries in the log that we were just hearing about? Well, Your Honor, that's the problem with the log. The log is so vague and ambiguous, it doesn't identify which doctors he allegedly sent these letters to, nor does he include any actual letters. So we don't know if he's talking about his hepatitis. We don't know if he's talking about he was diagnosed with a seizure disorder that he had had since the mid-'90s. So when he says, I wrote letters for medical care to these two doctors without identifying who any of them are and without including any of the actual letters, there's no way for us to know what any of that was. All I can tell you ñ Well, actually, he does identify the doctors in the log. I mean, I don't want to quibble with you, but he lists all these letters. He says to whom he sent it. He says in July of 2000, wrote a mail letter to Dr. Perry. Now, of course, I understand the letter's not in the record, but I think it's a misstatement to say he doesn't identify the doctors and doesn't identify what he asked for. Well, and I mean that in the sense of, yes, he does say that, and there are some identifications there. But what I would like to follow up with is that although he says he sent all these letters, what we do see is a clear record, especially with regard to Dr. Reese, of having made these 14 referrals out. And these were not times when Mr. Silvis came in and saw Dr. Reese, so it may have been in response to a letter or a response to some other health care request form. But the point is, is Dr. Reese still approved all of those requests and immediately referred him out on an urgent basis each and every time? Thank you, counsel. Your time has expired. Thank you. Mr. Weresville, you have some reserved time. Thank you, Your Honors. What I'd like to address first is what we just heard about Dr. Reese and Dr. Perry. First, with respect to Dr. Reese, I have here the log in front of me, and reading from one of the entries, SCR 137, September 8, 2003, I was seen by Dr. Reese at prison clinic. I told him about all the medical problems I was having and requested treatment for them. I also requested radiation treatment and physical therapy. Then September 13, 2003, two entries later, wrote and mailed a letter to Dr. Reese requesting radiation treatment and physical therapy that was recommended by Dr. Rahimapar and Dr. Pineda.  I would note that, as you yourself, Your Honors, noted, that this was attached to a declaration that was part of the record that the court admitted. The court admitted it as part of its record, and it does not appear that the court relied on it in making its determination. But with respect to the log itself, I would say that it is admissible because under Evidentiary Rule 1006, you are allowed the use of a summary chart or calculation to prove the content of voluminous writings, recordings, or photograph that cannot be conveniently examined in court. Well, except you don't have any volume of letters. Well, right, Your Honor. And what I think is part of the problem with that is you have to have something to summarize. You don't have the original documents. I do not have them with me as part of the record. However, what Mr. Silva's declaration says is that he is in possession of them. With respect to the State and the appellees, there's a footnote in one of the declarations. Unfortunately, I don't know which one, but one of the footnotes, I believe it's from Perry, it may have been, that said that the State could not locate Mr. Silva's records as part of this litigation. If he had them, he didn't put them in the record. Correct, Your Honor. I do agree with that, but we do have this log that summarizes what he had been doing. And as you correctly noted, it's part of a declaration where he signed it under penalty of perjury. Right. The problem, of course, this declaration, as I understand it, was submitted after his deposition, correct? That's correct. And one of the reasons why he submitted this declaration after the deposition is because what Ms. Hewitt, appellee's counsel, at deposition was getting out was that he didn't write any letters to any of the doctors until May of 2003. What Mr. Silva's declaration and the log was provided to show is that it was not correct, that it was actually as far back as May of 2000. One thing I'd also like to address with Dr. Perry is that he was the record shows that he was seen, that he saw Mr. Silva's in 2002. At that time, Mr. Silva's complained of headaches, and what Dr. Perry provided was a cane and ordered Mr. Silva's to receive a psychiatric evaluation for delusional medication. That's at SER 453 and 454 as part of Mr. Silva's deposition. What I would also note is that under the Lemire case from, I believe it's 2013, one of the tests is whether the officers had requisite knowledge of a substantial risk is a question of fact. That's at 726F3-1078. So what I posit to you is, number one, in conclusion, number one, there was substantial risk. Number two, there is serious medical need. We had a brain tumor. Number three, there was deliberate indifference. And even if you don't see that at this point, there is sufficient disputed facts to overcome summary judgment. Thank you. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Thomas, McKeown